Eastern District of Kentucky
**FILED**

MAR 2 1 2006

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION
CRIMINAL CASE NO. 05–91-KKC

UNITED STATES OF AMERICA,                    PLAINTIFF

VS.            **REPORT AND RECOMMENDATION**

JUAN RODRIGUEZ-DAVILA                         DEFENDANT

*******

This matter is before the Court upon the "Motion to Suppress" (DE#) filed by the defendant Juan Rodriguez-Davila. An evidentiary hearing was held on February 28, 2006, with the defendant personally present and represented by counsel. Two witnesses testified at the hearing: KSP Trooper Michael Bowling, Jr. and KSP Trooper Jason McCowan. The Court took judicial notice of the transcript of the preliminary hearing held on 12/22/05 in this case. DE#19, TR; Court Exh. 1. Three photographs of the defendant's vehicle were introduced as Exh. 1-3. Having considered the record, including the Motion (DE#20), Response (DE#24), Reply (DE#25), hearing testimony and evidence (DE#19, 27), the Magistrate Judge makes the following proposed findings of fact and conclusions of law:

## I. Issues Presented

The issues before the Court are 1) whether the officer lawfully stopped the defendant's vehicle, 2) whether, upon issuing defendant a courtesy violation and returning his valid license and other documents to him, the officers unlawfully detained him further for drug interdiction purposes in violation of the Fourth Amendment, and 3) during that extended encounter, whether the defendant voluntarily consented to a search of his truck. Defendant contends that his consent was obtained as the result of illegal detention and should be suppressed as fruit of the poisoned tree, whereas the United States contends that the defendant was free to leave, voluntarily answered the officers' questions, and voluntarily gave consent to search his truck.

## II. Findings of Fact

The following facts and allegations are taken largely from the testimony at the preliminary hearing on December 22, 2005 (DE#19) and the additional testimony at the suppression hearing on February 28, 2006 (DE#27).

On December 16, 2005, at approximately 1:00 p.m., KSP Trooper Bowling was off-duty, wearing civilian clothing, and traveling north on I-75 in his marked cruiser near London Exit 38. He noticed a silver Chevy pickup truck also traveling in a northbound direction, and observed it suddenly move over from the left passing lane across the middle lane, and into the right hand (slow) lane without signaling.[1] DE#19, p. 12;  DE#27, p. 5 ("he jerked over several lanes without signaling").  He suspected that the driver might be drunk or perhaps very tired. DE#19, p. 15-16. The officer briefly pulled alongside to "get a look at" the driver and to observe his mannerisms. DE#27, p. 6. He noted that the truck had a Texas license plate and patriotic symbols displayed on it. While following the defendant, Trooper Bowling radioed for assistance and advised that it was a possible "drug interdiction" stop. He followed the defendant' vehicle for about seven miles. During that time, he observed no other problems with defendant's driving. KSP Trooper McCowan, who was on-duty and in uniform, responded to the call and had a trained drug canine with him. He was patrolling on I-75 near the 49 mile marker, and was headed in a southern direction toward the vehicles of Trooper Bowling and the defendant.

When Trooper Bowling saw the other trooper's cruiser approaching on the highway, he activated his blue lights to signal the defendant to pull over. Defendant did so at approximately the 45 mile marker, and Trooper Bowling pulled in behind. DE#19, p. 3. Trooper McCowan crossed the median and stopped behind the two vehicles moments later. DE#27, p. 13. Trooper Bowling then "called [defendant] back to my vehicle" by motioning to him. TR#19, p. 17. Defendant complied and approached the officers.  Trooper Bowling showed defendant his police credentials and requested his driver's license, and defendant gave it to him. DE#19, p. 3. When asked about his driving, the defendant told the officers he thought his truck had a front-end problem. DE#19, p. 4, line 2.

After speaking with defendant for a few minutes, the officers determined that he was not "under the influence". DE#19, p. 17, lines 24-25; DE#27, p. 14.

---

[1]Trooper Bowling also indicated that the defendant's vehicle had weaved "side to side". DE#19, p. 4; DE#27, p. 6-7.

Defendant provided valid registration and insurance documents to the officers. DE#19, p. 18; DE#27, p. 14. Trooper Bowling testified that the defendant was fine while speaking about the traffic charges. DE#19, p. 5-6 ("Everything was fine. He was, you know, smiling and joking."); DE#19, p. 24. After verifying that the defendant's documents were in order, Trooper Bowling gave defendant a verbal courtesy warning. The officers returned the defendant's documents to him and defendant confirmed that he had received all of them all back. DE#27, p. 14. Trooper Bowling then stepped away, and Trooper McCowan began to speak with defendant. DE#27, p. 4.

Trooper McCowan asked defendant if he could ask him a few questions, and according to the troopers, defendant responded "yes" and stepped toward Trooper McCowan. DE#27, p. 5, line 7 and p. 14. Trooper McCowan then asked defendant if he "believed in the war on drugs", and defendant said that he did. DE#19, p. 19; DE#27, p. 14. Trooper McCowan continued to question defendant about illegal drugs, and separately asked him if he was carrying cocaine, heroin, or marijuana. DE#27, p. 15. Each time, defendant replied no, but told the officer that his friend's son smoked marijuana sometimes and might have smoked some marijuana in the truck. DE#27, p. 15.

Trooper Bowling later testified that during such questioning, he observed the defendant become "nervous". DE#19, p. 6, lines 2-5l, and p. 24, lines 1-4. He further testified that the defendant "would look down and away as he responded to questions", which mannerism the officer stated indicated deception. DE#19, pp. 22-23. He testified that Trooper McCowan then asked defendant "if he'd mind if we looked in the vehicle". DE#19, p.6, lines 18-19, and p. 24, lines 19-21. Trooper McCowan indicated that he asked defendant for and was given verbal consent to search. DE#27, p. 15. Trooper Bowling also heard the defendant give "verbal consent". DE#19, p. 6-7. The officers did not obtain defendant's signature on a written consent form during this encounter, nor was the incident otherwise recorded. DE#19, p. 7.

Trooper Bowling testified that Trooper McCowan ran the drug dog around the vehicle and then informed him that the dog had alerted on the bed of defendant's truck. Trooper McCowan crawled under the defendant's truck and saw signs suggesting that the truck had a false bottom. DE#19, p. 7. Trooper McCowan testified that he then took a drill and drilled holes in the compartment of the truck, whereby he observed a green leafy substance that he suspected was marijuana. DE#27, p. 21. The defendant's vehicle was then towed and impounded, and the officers transported the defendant to the police post. The DEA was notified, and

defendant was read his Miranda rights. While at the post, defendant signed a written waiver and consent to search the truck. DE#19, p. 7. He was then escorted to the truck. He showed the officers how to get into the hidden compartment, where they found approximately 80 pounds of marijuana. DE#19, p. 8.

## III. Conclusions of Law

### Fourth Amendment

A person's right to be free from unreasonable searches and seizures arises from the Fourth Amendment to the United States Constitution, which specifically provides:

> "The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Warrantless searches are per se "unreasonable" under the Fourth Amendment. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *United States v. Hudson,* 405 F.3d 425, 441 (6th Cir. 2005). However, there are several judicially recognized exceptions, including searches pursuant to consent. The burden is on the government to establish that a warrantless search falls within an exception to the warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

### Issue 1: Whether the Officer Lawfully Stopped the Defendant's Vehicle

In *Whren v. United States,* the United States Supreme Court held that "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). See also, *United States v. Ferguson,* 8 F.3d 385, 391 (6th Cir. 1993)(en banc), *cert. denied,* 513 U.S. 828 (1994); *United States v. Bailey,* 302 F.3d 652, 656 (6th Cir. 2002). Probable cause is generally

defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Graham*, 275 F.3d 490, 509 (6th Cir. 2001); *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir. 1990).

In the present case, Trooper Bowling testified that he observed the defendant's vehicle suddenly veer from the passing lane, cross the middle lane, and into the slow lane without signaling, and that he suspected the driver might be under the influence or very tired. This personal observation gave the officer adequate probable cause to stop defendant's vehicle for the traffic violation. Trooper Bowling testified that the stop was based upon reckless driving or careless driving. DE#27, p. 5. In light of such evidence, the defendant does not contest that Trooper Bowling had probable cause to make the initial stop of his vehicle. DE#20, p. 2.

However, defense counsel also accurately points out that before stopping defendant's vehicle, Trooper Bowling noticed that it had a Texas license plate, pulled alongside for a closer look, and then radioed for assistance for a possible "drug interdiction" stop. At the hearings, the officer explained that Texas was a common "hub" of drug distribution and that the vehicle had patriotic symbols, and an air freshener and/or religious symbol of Mary hanging from its rear view mirror. He explained that these could be "preliminary indicators" of drug trafficking, although he acknowledged they could also be entirely innocent. DE#19, p. 21-22. He testified that his initial reference to possible "drug interdiction" was due to the vehicle's Texas license plate and other "preliminary indicators", rather than the fact that defendant is Hispanic.[2]

Regardless of whether the officer anticipated possible "drug interdiction", he could stop defendant's vehicle for the traffic violation. "As long as an officer has probable cause to believe that a motorist has committed a traffic violation, the resulting traffic stop is generally reasonable under the Fourth Amendment regardless of the officer's subjective intent in stopping the vehicle". *Wren*, 517 U.S. at 813, 819; and see, *United States v. Wellman*, 185 F.3d 651, 655 (6th Cir. 1999)(holding that "even if the officer making a traffic stop is motivated by a suspicion that the defendant fits into a 'drug courier profile', the traffic stop is not unreasonable if probable cause for a traffic violation exists"); *United States v. Hill,*

---

[2] Although an officer may not stop a vehicle for "impermissible factors, such as the race of the car's occupants," *Whren*, 517 U.S. at 810, 116 S.Ct. at 1773, the Supreme Court has also explained that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813, 116 S.Ct. at 1774.

195 F.3d 258, 264 (6ᵗʰ Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000).

In the present case, Trooper Bowling's testimony about his observations of defendant's unsignaled sudden lane change was forthright and credible. Hence, the officer had a proper reason to stop the defendant's vehicle. Trooper Bowling first noticed the defendant's vehicle for this erratic driving and, in any event, the Sixth Circuit Court of Appeals has held that "it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop". *Ferguson*, 8 F.3d at 391.

**Issue 2: Whether the Officers Further Detained  the Defendant Without Reasonable Suspicion Past the Completion of the Traffic Stop In Order to Conduct Drug Interdiction Questioning, and thus Violated the Fourth Amendment, or Whether, Upon the Conclusion of the Purpose of the Traffic Stop, It Became a Voluntary Encounter Because Defendant Agreed to Answer the Officer's Additional Questions**

Defendant points out that, absent the observed traffic violation, the officer otherwise would have lacked reasonable suspicion to pull over his vehicle. Defendant argues that after the officer gave him a courtesy warning and returned his driver's license and other documents to him, "the traffic stop was completed and nothing that occurred during that stop was sufficient to create a reasonable suspicion of criminal activity." DE#20, p. 9. He contends that the officers then unlawfully detained him further for drug interdiction purposes in violation of the Fourth Amendment, and that the "search of his vehicle and fruits thereof must be suppressed". DE#20, p. 9.

The United States asserts that, upon receiving his documents back, the defendant was not further detained and was free to leave until such time as the drug dog alerted on the truck and Trooper McCowan conducted a visual search of the truck. DE#24, p. 2. The United States contends that "any questioning of the defendant by officers after his drivers license and other documents were returned to him, and after he was issued a warning citation, was a consensual encounter... and did not violate the Fourth Amendment." DE#24, p. 2.

In *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the United States Supreme Court considered the issue of whether a police encounter necessarily constituted a "seizure" of a person within the meaning of the Fourth Amendment, and thus, whether the fruits of an allegedly consensual search should be suppressed . The Supreme Court began its analysis by pointing out that

"the State concedes, and we accept for purposes of this decision, that the officers lacked the reasonable suspicion required to justify a seizure and that, if a seizure took place, the drugs found in Bostick's suitcase must be suppressed as tainted fruit."). *Bostick*, 501 U.S. 434-35, 111 S.Ct. at 2386.[3]

"Once the purposes of the traffic stop [are] completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004), *rhrg' en banc denied* (Feb. 3, 2005), quoting *Hill*, 195 F.3d at 264; and see, *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995); *United States v. Valdez*, 147 Fed. Appx. 591, 595 (6th Cir. 2005). Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop. *Smith*, 263 F.3d at 588; and see, *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Supreme Court has cautioned that "[r]easonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Reasonable suspicion is examined under a totality of the circumstances analysis. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998)(en banc), *cert. denied*, 525 U.S. 1123 (1999).

In the present case, Trooper Bowling testified that the defendant's driver's license, registration, and insurance documents were in order, and that he returned them to defendant and started to walk away. These events were routine, and the encounter had not been unreasonably prolonged for any other purpose. "A traffic stop is reasonable under the Fourth Amendment where the stop was both proper at its inception and reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Garrido Santana*, 360 F.3d 565, 570 (6th Cir. 2004), *cert. denied*, 542 U.S. 945 (2004); *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the

---

[3]The Supreme Court has observed that "the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct." *Terry*, 392 U.S. at 12, 88 S.Ct. at 1875. "A ruling admitting evidence in a criminal trial, we recognize, has the necessary effect of legitimizing the conduct which produced the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur." *Id.* at 13.

time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 837, 160 L.Ed.2d 842 (2005)(finding no constitutional violation where trooper stopped defendant for speeding, and second trooper walked drug dog around defendant's car while first trooper was writing a warning ticket).

Although nothing had developed during the traffic stop to indicate that criminal activity was afoot, the officers remained suspicious due to what they referred to as "preliminary indicators" of drug trafficking. At this point, Trooper McCowan asked defendant if he could ask him a few questions. When defendant stepped toward him and said "yes", Trooper McCowan then began questioning defendant about illegal drugs. In fact, he testified at the suppression hearing that the questioning was then in "interdiction mode". DE#27, p. 22. Trooper Bowling testified that they do not ask every driver about the "war on drugs" but that they usually do so when they "suspect criminal activity" and "we go into what's called a criminal interdiction stop". DE#19, p. 20-21.

However, the preliminary "indicators" admittedly did not give reasonable suspicion to detain defendant further. Trooper Bowling explained that Texas is a "hub for illegal activity", especially on Interstate 75, that the truck had patriotic symbols on it ("pray for our troops"), and that there were air fresheners and/or (possibly) a religious symbol hanging from the rear view mirror. DE#19, p. 21-22. When asked on cross-examination if patriotic symbols indicated criminal activity, the officers explained that he would not expect a "soccer mom" to be involved in criminal activity, but that patriotic symbols and Texas license plates could nonetheless be "indicators". DE#19, p.21-22. When defense counsel asked "is that enhanced by the fact that the defendant was Hispanic?", the trooper denied it. DE#19, p. 21, lines 22-25.

The Sixth Circuit Court of Appeals has held that some factors are "so innocent or susceptible to varying interpretations as to be innocuous." *Wood,* 106 F.3d at 946; *Smith,* 263 F.3d at 593-594; *Karnes,* 62 F.3d at 496. Certainly, patriotic and religious symbols on vehicles are ubiquitous and at best would be very weak indicators. "Reliance on the mantra 'totality of the circumstances' cannot metamorphose these facts into reasonable suspicion". *Wood,* 106 F.3d at 948. In determining whether an officer had reasonable suspicion to detain a person, the question is not whether there is a possibly innocent explanation for each of these factors, but whether all the factors known by the officers together give rise to a reasonable suspicion that criminal activity may be afoot. *United States v. Arvizu,* 534 U.S. 266, 274-75, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002);

*United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Cortez,* 449 U.S. at 419, 101 S.Ct. 690; *United States v. Jacob,* 377 F.3d 573, 577 (6th Cir. 2004). Here, the stated "preliminary indicators" admittedly did not provide reasonable suspicion to further detain defendant after the courtesy warning. See, e.g., *United States v. Townsend,* 305 F.3d 537, 541 (6th Cir. 2002) (finding that stated reasons for suspecting criminal activity were not sufficiently significant as a matter of law).

As the testimony elicited by defense counsel on cross-examination showed, these observations of "preliminary indicators" did not justify further detention, even when considered together.[4] A Texas license plate without more is hardly reason to suspect criminal activity, especially after the officers verified that the license plate was properly issued and current. Large numbers of vehicles have patriotic and/or religious symbols on them. When defense counsel asked at the suppression hearing "would it be fair to say that up until he was asked about the war on drugs, nothing occurred that would have added to what you had before you pulled him over?", Trooper Bowling candidly responded "Correct". DE#27, p. 10. Trooper McCowan testified that defendant did not become extremely nervous until *after* he began questioning defendant about carrying marijuana. DE#27, p. 22.

Hence, the analysis must focus on whether the remainder of the encounter was voluntary. Absent reasonable suspicion that criminal activity was afoot, the only way continued questioning would be lawful is if the encounter between Trooper McCowan and the defendant was entirely consensual and voluntary on the defendant's part. The Supreme Court explained in *Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968), that not all encounters between policemen and citizens will involve the "seizures" of an individual. The United States contends that upon conclusion of the traffic stop, the defendant was "free to leave", but *voluntarily* agreed to answer Trooper McCowans' further questions.

In *Florida v. Royer,* 460 U.S. 491, 75 L.Ed.2d 229, 103 S.Ct. 1319 (1983), the United States Supreme Court explained that an officer does not violate the Fourth Amendment by merely approaching a person on the street or in another public place and then asking if he is willing to answer some questions. See also, *Bostick,* 501 U.S. 434-35, 111 S.Ct. at 2386 ("a seizure does not occur simply because a police officer approaches an individual and asks a few questions");

---

[4]Although Trooper McCowan's "hunch" that motivated his continued questioning of defendant was ultimately proven correct, Fourth Amendment analysis is not "results-oriented".

*Tillman*, 963 F.2d at 142. The Supreme Court explained that an encounter is consensual and no reasonable suspicion is required so long as a reasonable person would feel free "to disregard the police and go about his business". *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991).

Defendant counsel points out that the police did not initially approach him on foot to ask him some questions, but rather, had already stopped his vehicle on the side of the road with a valid show of authority ("blue-lights" on a marked cruiser). In *Bostick* and *Royer*, the individuals were approached in a public place by police on foot and had not been detained by police moments earlier. The Sixth Circuit Court of Appeals noted this very point in *Richardson*, 385 F.3d at 634:

> "One may attempt to distinguish *Bostick* or *Royer,* where the officers approached the defendants for questioning while the defendants were not in legal custody, from the present case, where the occupants were in legal custody until the purposes of the traffic stop were completed, and then were posited questions and asked to consent to a search, by arguing that in the latter case an individual may not feel as if he has a right to refuse the officer's request because he was just in legal custody and, in fact, may believe he still is in legal custody. However, unless the officer's conduct and questions intimated that answers were obligatory, then such a concern would merely go to the voluntariness of the consent."

Turning to the question of whether "the officer's conduct and questions intimated that answers were obligatory", the Supreme Court has observed that "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19, 88 S.Ct. 1868. In *Hodari D.*, 499 U.S. at 626, 111 S.Ct. 1547, the Supreme Court reiterated that a Fourth Amendment "seizure" occurs when there is (1) a show of authority by officers, and (2) the defendant submitted to that show of authority. The record here contains no evidence that Trooper McCowan engaged in overtly coercive conduct in asking defendant whether he would answer more questions. Trooper Bowling had just concluded any detention for purposes of the traffic stop. Trooper McCowan specifically asked defendant if he would answer some questions and did not engage in a "show of authority".

In *Bostick*, the Supreme Court explained that the test was whether, "taking into account all of the circumstances surrounding the encounter, the police

conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business". *Id*. 501 U.S. at 437, quoting from *Chesternut*, 486 U.S. at 569, 108 S.Ct. at 1977. The *Bostick* Court further indicated that "[w]e adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine wether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id*. 501 U.S. at 439.

Defense counsel argues that the United States's suggested interpretation of events essentially requires an untenable legal fiction, whereby a person already stopped for a traffic violation (by multiple officers with a drug dog) is assumed to know that he is free to leave (even though not so advised by the officers) and that after the initial show of force for the traffic stop, such initial valid detention was converted to a voluntary encounter for drug interdiction purposes (even though they lacked reasonable to detain further) and then back to detention shortly thereafter, without defendant ever being fairly apprised of the allegedly voluntary aspects of the situation. Defense counsel correctly points out that there was "[n]o statement of any kind by either officer which would indicate the detention phase of the encounter had ended and the consensual phase had begun." DE#25, p. 3.

Although the officers testified that the defendant could have refused to answer any further questions, neither officer ever actually informed the defendant that he was "free to go" or that he could refuse to answer any further questions.[5] DE#27, p. 11, 24. There is no question that defendant was detained by officers until given the courtesy warning, and that the officer's "request" to ask more questions followed immediately. Defense counsel urges that under the circumstances of this case, "any reasonable person would conclude, the detention represented by the traffic stop was still ongoing when the officer wanted to ask more questions." DE#25, p. 3. Defense counsel essentially argues that the circumstances in the present case do not indicate consent, but rather, mere acquiescence to the officers' authority.

However, the United States accurately points out that defendant's

---

[5]Trooper Bowling testified that he heard Trooper McCowan explain to defendant that he was "free to go" but then clarified in the next sentence that *defendant was not verbally told he was free to go*. DE#27, p. 4-5. The officer was apparently equating the return of defendant's documents with the status of being free to leave.

documents had been returned to him, that the troopers asked him if all his documents had been returned to him, that defendant indicated he had all his documents, that this was a routine matter conducted in ordinary conversational tones, and that Trooper Bowling then began to walk away. Even though not specifically so advised, this would certainly signal to a reasonable person that the traffic stop had concluded and that he was free to leave. "When a law enforcement officer no longer has any reasonable suspicion of criminal activity, the detained individual is constitutionally free to leave..." *Erwin*, 155 F.3d at 823. Trooper McCowan then asked defendant "if he could ask him some questions", and defendant stepped toward him and responded "yes". Although defendant was not advised he was free to leave, the totality of the circumstances indicates that the police conduct fairly indicated the traffic stop was over and that defendant could go about his business.

The Supreme Court has rejected the argument that an officer must specifically advise a person he is free to go in order for the remainder of the encounter to be voluntary. See *Ohio v. Robinette*, 519 U.S. 33, 35, 117 S.Ct. 417, 419 (1996). There, the Supreme Court emphasized that the Fourth Amendment test is whether the consent was voluntary, as determined under the totality of the circumstances. *Id*. Similarly, in *Schneckloth v. Bustamonte*, the United States Supreme Court rejected the argument that defendant had to be specifically informed that he had a right to refuse in order his consent to search to be valid. Again, the Court emphasized evaluation of the totality of the circumstances. 412 U.S. at 227, 93 S.Ct., at 2048.

The record reflects that the defendant has had extensive experience with the criminal justice system, has been stopped many times for traffic violations and other matters, and that in all likelihood, he was well aware of his rights. In any event, the United States correctly points out that Trooper McCowan did specifically ask defendant "if he could ask him some questions" before proceeding to do so. Such question did not involve any additional "show of authority". Defendant did not attempt to end the encounter at such time or indicate in any way that he wished to do so.

Defense counsel argues that, given that officers did not advise defendant he was free to go and did not have to answer any more questions, a reasonable person would not have felt free to end the encounter. The average traffic stop does not involve two officers with a drug dog, unless something has happened during the traffic stop to justify further detention and call for a drug dog. Here, the officer called in advance based on "preliminary indicators" that did not in themselves

justify a stop, and then, when no additional suspicion developed during the stop for the traffic violation, sought verbal consent to search. Although it is a close issue in some respects, the defendant's argument depends largely on giving substantial weight to the fact that he was not advised he could leave and/or decline to answer questions, and on the "inherent" coerciveness of the situation as a just-concluded traffic stop. The United States Supreme Court itself has observed that: "Certainly few motorists would feel free to either disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Berkemer v. McCarty*, 468 U.S. 420, 436, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984). In fact, Justice Stevens pointed out in his dissenting opinion in *Robinette*, 519 U.S. at 47, 117 S.Ct. at 425, that:

> "A learned commentator has expressed agreement on this point. See 4 W. LaFave, Search and Seizure § 9.3(a), p. 112 (3d ed.1996 and Supp.1997) ("Given the fact that [defendant] quite clearly had been seized when his car was pulled over, the return of the credentials hardly manifests a change in status when it was immediately followed by interrogation concerning other criminal activity")..."

In the present case, the officer testified that the defendant could have said "no and walked away" instead of answering any more questions. DE#27, p. 10. Had the officer approached the defendant on the street and simply asked for information, this assertion obviously would be more persuasive. For example, in *United States v. Weaver*, 282 F.3d 302, 311 -312 (6th Cir. 2002), the Sixth Circuit Court of Appeals observed that:

> "Weaver was a pedestrian and could have walked away from the encounter. Admittedly, doing so may have created an awkward situation between Weaver and Officer Leeds, but awkwardness alone does not invoke the protections of the Fourth Amendment, particularly so when the test employed is an objective one. Unlike those situations that may occur in the traffic stop context, pedestrian encounters are much less restrictive of an individual's movements....."

Defense counsel argues that, after already submitting to a show of authority

("blue-lights") by the officers, it is questionable whether any reasonable person would actually feel free to refuse the officer's continued "requests" and simply drive off, given that it might raise suspicion and cause the officer to redouble his efforts. The time frame during which the additional questions were asked was extremely brief. Of course, if the defendant had actually indicated that he wanted to leave or did not wish to answer any more questions, but the officers had persisted, we would be presented with a very different issue.

A reasonable person normally would not expect the presence of multiple officers and a drug dog when they are stopped for an ordinary traffic violation. Despite such heightened presence, the circumstances here do not reflect objectively coercive behavior by the officers. The officer did not use any force against defendant in any way and did not use any overtly misleading tactics to obtain his consent. There was no show of force to "persuade" defendant to answer more questions. The officer simply asked the defendant if he could ask him some questions. The record does not suggest that such question was couched in an intimidating or threatening manner that might have suggested that answering was obligatory, rather than optional. None of the factors found persuasive in other decisions are present. For example, the officers did not instruct defendant to remain at the cruiser, did not withhold his license, and did not unreasonably prolong checking the license or writing the traffic ticket in order to buy time to investigate further without adequate justification. See, e.g., *Richardson*, 385 F.3d at 629; *Smith*, 263 F.3d at 594 -595.[6]

In the present case, defendant essentially urges that this court should find that he acquiesced to the authority of the officers without realizing that he did not have to answer any further questions. However, Trooper McCowan did in fact ask defendant if he would answer some questions. Defendant said "yes". Given that the officers had returned his documents, combined with the facts that Trooper McCowan specifically asked defendant if he could ask him additional questions and that the officers did not engage in any objectively coercive or punishing behavior to obtain defendant's agreement, in light of all the circumstances

---

[6]In *Smith*, the detainee (unlike the present defendant) had received his license back but then refused to consent to a search of his vehicle. The officers lacked a basis to detain him further, but did so anyway while they ran a drug dog around the vehicle. The Sixth Circuit Court of Appeals affirmed the lower court's holding that the officers had improperly detained the defendant and other occupants of the vehicle beyond completion of the traffic stop in violation of the Fourth Amendment. The fruits of the illegal seizure and subsequent search were therefore suppressed.

surrounding the brief encounter, it is recommended that the defendant willingly
agreed to answer these questions and was not improperly subjected to further
detention.

## Issue #3: Whether Consent was Voluntary

The next question is whether the defendant voluntarily gave his consent to
search. "The Fourth Amendment test for a valid consent to search is that the
consent be voluntary." *Robinette*, 519 U.S. at 40, 117 S.Ct. 417. An officer may
conduct a warrantless search when the person with a legitimate expectation of
privacy in the place to be searched gives free and voluntary consent. *Schneckloth,*
412 U.S. at 219-22, 93 S.Ct. 2041. The present defendant would clearly have a
privacy interest in the vehicle he was driving.

To be valid, the defendant's consent must have been given freely and
voluntarily. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20
L.Ed.2d 797 (1968); *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004),
*cert. denied*, 543 U.S. 1155 (2005). The consent must not be the product of duress
or coercion. *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988). "The
question of whether a consent to search is voluntary and knowing is a question of
fact to be determined from totality of all the circumstances." *Schneckloth*, 412
U.S. at 227. The burden of establishing the validity of the consent is upon the
government. *Id.* The government must demonstrate by clear and positive testimony
that the defendant consented to the search. *United States v. Haynes*, 301 F.3d 669
(6th Cir. 2002); *Jones*, 846 F.2d at 360. The defendant's consent must be
"unequivocally, specifically, and intelligently given, uncontaminated by any
duress and coercion." *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992).

Trooper McCowan could properly ask defendant for consent to search. In
*Bostick,* 501 U.S. at 431, 111 S.Ct. at 2384, the Supreme Court explained that
police officers may ask a person for consent to search, so long as a reasonable
person would understand that he could refuse to cooperate. The Supreme Court
noted that if the purported consent resulted from police intimidation or
harassment, it was "not consent at all." *Id.* at 439, 111 S.Ct. at 2389. The
testimony at the hearing indicates that Trooper McCowan asked defendant for
consent in plain language before proceeding further. Trooper Bowling confirmed
that he heard defendant give his consent to search when Trooper McCowan asked
for it. At no time did Trooper McCowan suggest to defendant that a refusal to

consent would be futile or that his wishes would be disregarded or otherwise held against him if he refused. See, e.g., *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999)(consent is not "merely a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request."). Defendant verbally indicated that the officers could look in his truck.

Defense counsel correctly points out that the officers did not inform defendant that he could refuse consent to search. However, the United States Supreme Court has rejected the argument that consent is per se invalid unless the defendant was informed that he had a right to refuse. *Schneckloth*, 412 U.S. at 227, 93 S.Ct., at 2048. The Supreme Court emphasized that the Fourth Amendment test for valid consent to search is whether the consent was voluntary, as determined under the totality of the circumstances. *Id.* "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent. *Id.*

In considering the "totality of the circumstances", courts will examine relevant factors, such as the defendant's age, intelligence, and education; whether he understood his constitutional rights; the length and nature of the detention; and the use of coercive or punishing conduct by the police. *Tillman*, 963 F.2d at 143. Defendant is an adult of ordinary intelligence and was only detained for a relatively short time during the traffic stop. Defendant's past experience with the justice system suggests that he may have been well aware of his constitutional rights, even if the officers did not specifically advise him he could refuse to consent.

Moreover, the circumstances in the present case do not reflect objectively punishing or coercive behavior by the officers. The officers did not withhold defendant's license or otherwise restrain him in any way, did not yell at or physically use force against him, and did not use any abusive or misleading verbal tactics to obtain his consent. An obvious show of force or other objectively coercive behavior was simply not present here. The officers did not engage in any objectively coercive or intimidating behavior and requested consent to search in normal conversational tone. The record does not suggest the use of any intimidation, aggression or other type of force that might invalidate consent.

Defendant correctly points out that the officers did not provide defendant with a written consent form to sign until *after* the roadside search was performed. *Cf. Robinette*, 519 U.S. 33 (where the entire encounter and conversation with

defendant was recorded and such tape was introduced into evidence).[7]  To the extent a written consent form was presented to defendant after his vehicle had been partially searched and towed, "the government cannot rely on the consent form signed by [defendant] to justify the search after the fact." *United States v. Lewis*, 231 F.3d 238, 241 (6th Cir. 2000). Of course, such consent form was probably intended to apply to the subsequent and more thorough search, during which defendant actually showed the officers how to gain access to the false compartment in the truck. In any event, it is the validity of the initial verbal consent that is before this Court.

To the extent defense counsel argues that defendant merely acquiesced to police authority, the United States Supreme Court has held that a search would not fall under the consent exception to the general warrant requirement if defendant's verbal consent was merely a submission to authority. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)("mere submission to a claim of lawful authority" does not constitute voluntary consent to search); *Bumper*, 391 U.S. at 548-49 (mere "acquiescence to a claim of lawful authority" does not constitute valid consent). However, a "defendant must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police in order to invalidate consent." *United States v. Elkins*, 300 F.3d 638, 648 (6th Cir. 2002), quoting *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir.1995). The United States contends that the police did nothing wrong in asking the defendant if he would consent to a search of his vehicle. The United States points out that the police officers did not engage in any objectively improper actions or overt aggression that would invalidate the defendant's consent.

The hearing testimony does reflect that the events were conducted in a relatively calm manner, without physical force or restraint of defendant. For example, the officers did not withhold his license or threaten the defendant in any way in order to obtain his consent. Defendant is an adult, presumably of normal intelligence, who could comprehend the officer's plain request. The United States has provided testimony showing that when defendant was asked for consent for

---

[7]A consensual search is generally limited by the scope of the consent that supports it. *Walter v. United States,* 447 U.S. 649, 656-57, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); *Elkins*, 300 F.3d at 648. It is noted that Trooper McCowan testified that he actually drilled holes in the defendant's truck during the stop on the Interstate. DE#27, p. 20-21. The record does not reflect that defendant agreed to this. A person who has given consent for an officer to "look in the vehicle" would not reasonably believe that the scope of such consent would include physically damaging the vehicle by drilling holes in it.

the officers to "look in his vehicle", he indicated with no hesitation that they could. Defendant did not ask questions or otherwise indicate he had any concerns about giving consent. The record reflects that at that point in time, the defendant's license had been returned to him and he was not restrained in any way. If the defendant voluntarily gave consent to search the vehicle, the officers could lawfully search it. *Schneckloth,* 412 U.S. at 219. "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." *Hudson,* 405 F.3d at 441; *United States v. Jenkins,* 92 F.3d 430, 436 (6th Cir. 1996); *Schneckloth,* 412 U.S. at 219, 93 S.Ct. at 2041.

Given the straightforward and credible hearing testimony indicating that the defendant verbally gave Trooper McCowan consent to search his truck, and given the absence of any objectively coercive behavior by either officer, the record reflects that the United States has carried its burden of showing by clear and positive testimony that the defendant voluntarily consented to the search of his truck. The search of defendant's vehicle may be upheld as "consensual".

## RECOMMENDATION

It is **RECOMMENDED** that "Motion to Suppress" (DE#20) by the defendant Juan Rodriguez-Davila should be **DENIED**.

By the agreement of the parties, particularized objections to this Report and Recommendation must be filed within three (3) days of the date of service of the same or further appeal is waived. *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 728 F.2d 813 (6th Cir. 1984), *affirmed,* 474 U.S. 140 (1985). Poorly drafted objections, general objections or objections that require a judge's interpretation should be afforded no effect and are insufficient to preserve the right of appeal. See *Howard v. Secretary of Health and Human Services,* 932 F.2d 505 (6th Cir. 1991). Also by the agreement of the parties, a party may file a response to another party's objections within three (3) days after being served with a copy thereof. Rule 72(b), Fed. R.Civ.P.

This the 21st day of March, 2006.



Signed By: 
J. B. Johnson, Jr.
United States Magistrate Judge